**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

RAFAEL AGUILA,

                Plaintiff,

       v.

PHILIPS MEDIZIN SYSTEME
BOEBLINGEN GMBH, and,

PHILIPS NORTH AMERICA, LLC,

                Defendants.

Civil Action No.: 23-cv-3838 (JMB/DJF)

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

RECEIVED

DEC 18 2023

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**INTRODUCTION**

1. Plaintiff Rafael Aguila ("Aguila") hereby files this legal complaint against Philips Medizin Systeme Boeblingen GmbH ("Philips Boeblingen") and Philips North America, LLC ("Philips NA") (collectively "Philips" or "Defendants").

2. On February 14, 2023, a Philips Boeblingen employee, Nina Hamann, sent an email from her company account to her supervisor, Minori Carlsson, in Minnesota. The email falsely accused Aguila of sick leave fraud and blackmail. Carlsson's acceptance of these unfounded accusations without proper verification, contributed to Aguila's termination from Philips Boeblingen on August 30, 2023.

3. Lee Evans, a Senior Vice President at Philips NA, also played a role in Aguila's job termination. Concurrently with Hamann's email, Evans influenced Aguila's job termination by misrepresenting Aguila's whistleblowing on Evans's academic plagiarism as a privacy violation.

4. Philips initially pursued the termination of Aguila based on the accusations made by both Hamann and Evans on February 21, 2023. Nevertheless, on October 11, 2023, Philips withdrew these allegations, acknowledging the baselessness of the claims initially levied against Aguila.

5. Hamann's February 14, 2023, email represents one instance in a systematic pattern of retaliation aimed at Aguila by Philips. This pattern is exemplified by Hamann's egregious act of extolling a Nazi-affiliated relative in a meeting with Aguila, a deeply offensive conduct specifically

designed to target Aguila's Jewish heritage. Collectively, these actions manifest a hostile work environment and a concerted effort to degrade Aguila's personal dignity.

6. Prior to these events, the Philips Ethics Department examined Hamann's conduct on October 10, 2022. Triggered by several instances of her bullying behavior towards fellow Philips employees, this investigation laid bare Hamann's persistent violation of workplace professionalism. The inquiry raised significant alarms about Hamann's commitment to maintaining professional standards and ethics within Philips.

7. Nevertheless, based on Hamann's unsubstantiated claims, Philips tried again to fire Aguila on June 30, 2023, for cause, based on a biased interpretation of his complaints against Hamann. The unjust treatment of Aguila, particularly for raising legitimate concerns about Hamann's anti-semitic remarks, discourages the reporting of discriminatory actions and sets a harmful precedent. This stance not only unfairly targets Aguila but also suggests an oppressive response to employees who confront hate speech and discrimination. Furthermore, without substantiating evidence, Philips's misrepresentation of Aguila's valid complaints as fabrications was based solely on Hamann's denials. This approach of Hamann's unsubstantiated denials as the basis for Aguila's dismissal, exemplifies a disturbing trend of retaliatory and defamatory tactics against employees who challenge unethical behaviors.

8. Philips's indifference to ethical practices is also evident in Aguila's efforts with Philips's IntelliVue patient monitors. Aguila advocated for rectifying a deadly defect in older IntelliVue models, linked to over 20 patient deaths. Facing substantial resistance from Carlsson and Hamann, who seemed to favor Philips's profit margins over a necessary recall of these models, Aguila became increasingly marginalized. His commitment to reporting these defects to the FDA was recognized by FDA safety expert Dr. Loriano Galeotti, whose commendation, "I also want to thank you for your integrity and your efforts to ensure the safety of the patients," contrasted sharply with Carlsson and Hamann's indifference to the issue. This situation underscores a concerning gap between Philips's stated values and their actual conduct.

9. In conclusion, Aguila asserts claims of defamation, retaliation, and intentional infliction of emotional distress against Philips, seeking redress for the extensive economic and non-economic harm inflicted by Defendants' disinformation. These claims encompass not only compensation for the tangible and intangible losses endured, but also punitive damages as a deterrent against future misconduct. Additionally, Aguila seeks a permanent injunction to prevent any further dissemina-

tion of defamatory information. Finally, Aguila demands a court-ordered retraction, mandating the Defendants to fully and unequivocally withdraw their false statements and implications, thereby restoring Aguila's reputation and professional standing.

## JURISDICTION AND VENUE

10.     This Court holds subject matter jurisdiction under 28 U.S.C. § 1332, due to the diverse citizenship of the involved parties: Philips Boeblingen (a German corporation), Philips NA (based in Massachusetts), and Aguila (a U.S. citizen from Florida), with a disputed amount surpassing the $75,000 threshold. The critical incident of Hamann's dispatch of a defamatory email on February 14, 2023, to Carlsson, who is located in Minnesota and employed by Philips NA, ostensibly as a retaliatory measure against Aguila's ethics complaint against Hamann, establishes a direct connection to Minnesota. Additionally, the involvement of Evans, a Philips NA employee, who contacted the HR department to influence Aguila's job termination, further connects Philips NA to this case. Hamann used Philips's corporate email system to disseminate the defamatory email. This series of actions, including the influence exerted by Carlsson, underscores the applicability and importance of Minnesota's legal statutes to this case. Jurisdiction is further reinforced under the Minnesota Whistleblower Act and the Minnesota Human Rights Act, relevant to Aguila's claims of defamation and retaliatory actions.

11.     Venue is appropriately established in this district pursuant to 28 U.S.C. § 1391(b), given the substantial occurrence of actions pertinent to the claim within this jurisdiction, including the sending of the defamatory email to this state about Aguila. This event forms the core of the legal claim and establishes this district as a suitable and relevant location for judicial proceedings.

## PARTIES

12.     Rafael Aguila is a U.S. citizen who is a resident of Florida, but is currently located in Germany. From July 1, 2019, to August 30, 2023, Aguila was employed as a regulatory compliance specialist by Philips Boeblingen.

13.     Philips Boeblingen is a foreign corporation based in Germany. Its primary office is situated at Hewlett-Packard-Str. 2, 71034 Boeblingen, Germany. This entity functions as a subsidiary of Philips Medical Systems International BV ("Philips MSI"). Philips NA, is recognized as

the U.S. agent for Philips Boeblingen, as indicated on the FDA's website. Philips Boeblingen employed both Aguila and Hamann.

14.     Philips NA is based in Massachusetts and employs significant personnel directly related to this litigation. As the Head of Regulatory Affairs for Philips NA, Carlsson manages regulatory compliance across various regions, including the United States and Germany. Her role involves overseeing regulatory teams and is integral to the regulatory processes relevant to this case. Addition, Evans's instructions to the Philips Boeblingen HR department, to influence the termination of Aguila, directly links Philips NA to the core issues of this lawsuit. The employment of both Carlsson and Evans at Philips NA underscore the subsidiary's involvement in the alleged actions and decisions central to the plaintiff's legal claims.

15.     Collectively, Philips Boeblingen, Philips MSI, and Philips NA are subsidiaries under the umbrella of Koninklijke Philips N.V. ("Philips NV"), forming an integrated network within the Philips corporate family.

## FACTUAL ALLEGATIONS

### Carlsson's Retaliation to Aguila's Safety Advocacy on the IntelliVue Monitor Defects

16. Aguila joined Philips on July 1, 2019, tasked with ensuring regulatory compliance for their IntelliVue patient monitors, constituting about 40% of all monitors in U.S. acute care facilities. Aguila's responsibilities included ensuring that the IntelliVue monitors continued to adhere to various international and FDA regulatory standards.

17. On May 3, 2022, Carlsson, a resident of Shoreview, Minnesota, and Aguila's direct manager at the time, informed both Aguila and Monica da Silva about a systemic defect in the IntelliVue patient monitors. This defect was directly linked to the deaths of at least 20 patients. However, Philips's engineers had developed a software solution to this flaw called "Software Revision P.00". Unfortunately, this software revision would only be offered to the newest IntelliVue models. This decision leaves most of the older models without the software update, leaving the same systemic defect in place with those unfixed older models. Aguila, responsible for the regulatory compliance of many older IntelliVue models, pushed for these models to be included in the "Software Revision P.00" update.

18. Carlsson informed him that Philips will offer this update for free, breaking from their standard practice of charging for major software updates. This decision was a response to the deaths

linked to the IntelliVue's flaw, aiming to accelerate the updating process by hospitals to the latest P.00 software revision. However, Philips restricted the update to newer models only. Consequently, multiple older models, still in widespread use, remained with the unaddressed, hazardous flaw. Philips's decision to fix only newer IntelliVue models thwarted Aguila's efforts to secure a comprehensive update for all models. This approach disregarded critical safety issues in older IntelliVue models, which remain operational in hundreds of U.S. hospitals, compromising patient safety due to the unresolved flaw.

19. Carlsson advised Aguila not to be concerned about the older IntelliVue models missing the software update. The rationale was that many hospitals would likely purchase new IntelliVue models since the older ones were ineligible for the latest "P.00" software version. However, this approach disregarded the ongoing risks posed by the older models still in use, which retained the unresolved systemic flaw, thereby compromising patient safety. Aguila's concerns about these older models were thus overshadowed by Philips's prioritization of marketing newer models over addressing existing safety issues in their product range.

20. In addition to urging Aguila not to focus on the risks of leaving the flaw on the older IntelliVue models unchanged, Carlsson disclosed that Philips intended to keep the quiet recall of the newer IntelliVue models a secret from the FDA. This strategy was motivated by concerns that public acknowledgment of the defect could be embarrassing for Philips. It could potentially deter customers, and attract unwanted scrutiny and inspections from the FDA. This revelation highlighted a preference for corporate image and market considerations, over transparent communication with regulatory authorities, raising ethical concerns about Philips's commitment to patient safety and regulatory compliance.

21. Despite Carlsson's stance, Aguila emphasized to her that many hospitals were likely to continue using their older IntelliVue models, given their durability of over 20 years. Aguila pointed out that the decision not to upgrade these older units meant that the identified flaw would remain unresolved, leading to further patient harm. Aguila highlighted that this ongoing risk was entirely preventable, as an effective and ready solution existed with the IntelliVue software revision P.00. His insistence on this matter highlighted a critical safety concern, underscoring the need for Philips to extend the P.00 software update to all IntelliVue models to prevent further avoidable patient injuries and deaths.

22. Aguila persistently raised concerns about the IntelliVue patient monitors' systemic defect. In response, around August 2022, Carlsson reassigned Aguila from the regulatory team responsible for software updates and new products, known as the "NPI" (New Product Introduction) group. Despite overseeing the entire Philips regulatory department, Carlsson also personally managed the NPI group, as shown in the organizational chart below. Carlsson's active management of the NPI group stemmed from its pivotal role in submitting new FDA applications, where timely approvals were crucial to Philips's revenue, highlighting the direct financial impact of any regulatory delays.



23. In what appeared to be a retaliatory move, Carlsson transferred Aguila around August 2022 to a group led by Hamann, which focused predominantly on regulatory issues related to older or obsolete products. This decision was opposed by Aguila and his NPI colleagues, including da Silva, due to Aguila's extensive experience with FDA submissions, a critical function of the NPI group. Despite these reservations, Carlsson remained resolute in her decision to transfer Aguila to Hamann's group, overlooking the voiced concerns from NPI team members about the detrimental impact this reassignment would have on the group's operational efficiency.

24. Given Carlsson's role within Philips NA, her actions reflect on Philips NA's operational practices and decision-making processes. Therefore, Aguila believes that under the doctrine of vicarious liability, Philips NA could be held legally responsible for Carlsson's actions, as they were performed within the scope of her employment and managerial authority within the company. This liability encompasses not only her direct actions but also the implications of those actions, including creating a work environment that seems to retaliate against Aguila for raising legitimate safety concerns.

**Philips's Ethics Compliance Department investigated Hamann's Bullying Behavior**

25. As the newest addition to Hamann's team, Aguila was taken aback by an email he received from Hamann on September 27, 2022. In this email, circulated to the entire regulatory department, Hamann highlighted her difficulties with Klaus Schmid, who worked for a different department at Philips. Hamann attached unauthorized screenshots from their private Microsoft Teams conversation to this email, violating Philips's policies on privacy and the automatic deletion of Teams chats. The email outlined Hamann's grievances with Schmid, expressing her frustrations:

- "I share my issues that I have with Klaus".
- "I use this example to make transparent the non-cooperative behavior we are facing".
- "So, I will continue to ping and call him until I have my Meeting next week Oct 6 with his Manager… just as a record".
- "You may find this kindergarten-like and a waste of time, or not right investment of time, … but I hope by this transparency I can convince his manager to take actions that will make Klaus be more supportive moving forward".

26. On September 29, 2022, Aguila reached out to Axel Lange, who was in charge of the Ethics Compliance Department at Philips Boeblingen, to report Hamann's email dated September 27, 2022. In response, Lange acknowledged the severity of the situation, remarking that he had never encountered such a blatant breach of multiple Philips policies, encapsulated within a single email as evidenced in Hamann's communication.

27. On October 6, 2022, Hamann continued publicly disparaging Schmid within the regulatory department. On this date, Hamann sent a new email announcing a planned meeting with Schmid, where Hamann would be "explaining what cooperation means to us." Aguila viewed Hamann's threat as an intimidating tactic against Schmid, akin to those employed by fictional mob characters like Tony Soprano or Vito Corleone, contrasting starkly with the professional conduct expected of a manager at a multinational corporation like Philips.[1]

28. Furthermore, the fact that seven days had elapsed since Aguila's complaint to Lange, with Hamann still openly targeting a colleague without any apparent intervention, raised serious concerns for Aguila about the effectiveness and responsiveness of the Ethics Compliance Department.

---

[1] This was not an isolated case of Hamann's bullying behavior. During the preparations for a team-building event at a zipline park, scheduled on September 2, 2022, Matthias Moell opted out of the zipline activity, citing his weight considerations. Hamann's subsequent mocking of his weight was both inappropriate and degrading, particularly in the presence of all his colleagues.

This situation highlighted a troubling disconnect between the department's stated role in upholding employee welfare, and its actual enforcement.

29. On October 10, 2022, Lange finally invited Hamann to address Aguila's confidential complaint against her. This invitation is corroborated by Hamann's email from February 14, 2023, where she wrote: "Oct 10: Nina receives invite for compliance case." After this interaction with Lange on October 10, 2022, Hamann ceased her verbal and written attacks on Schmid.

30. However, during a team meeting the following day, on the morning of October 11, 2022, Hamann expressed to her regulatory team the high value that she places on "trust", likening the team to her "family." Hamann expressed feelings of betrayal, asserting that a team member's choice to file a complaint against her, bypassing direct communication, constituted a breach of her trust.

**Hamann's Antisemitic Verbal Assault on Aguila on October 11, 2022**

31. On October 11, 2022, Hamann invited Aguila for a teleconference on Microsoft Teams to discuss project responsibilities. In the meeting, Aguila redirected the discussion to the "P.00" software update for the IntelliVue monitors. Aguila highlighted ethical concerns about Philips's choice to exclude older models like IntelliVue MP5, which he oversaw and was still being actively sold, from receiving this crucial update. This ongoing sale of models with a known defect was at odds with Aguila's Jewish ethical beliefs, particularly the principle of "*pikuach nefesh*" (פיקוח נפש) or "saving a life." This Jewish tenet emphasizes the supreme importance of preserving human life. Aguila's objections were rooted in this belief, underlining his commitment to patient safety by advocating for a remedy to the fatal flaw in these medical devices.

32. It remains unclear if Hamann was previously aware of Aguila's Jewish heritage. However, strikingly, the moment Aguila referenced his Jewish faith, Hamann's demeanor dramatically shifted. She proceeded to speak about her great-uncle, Joachim Hamann, highlighting his SS affiliation and his direct involvement in the persecution of Jews during World War II, a disturbing turn in the conversation that appeared to be a targeted response to Aguila's mention of his religion. This sudden shift in the conversation's direction was startling, leaving Aguila profoundly disconcerted. After Hamman recounted her disturbing family history, Aguila's only response was to comment on her extensive historical knowledge, observing a notable shift in Hamann's mood from initial anger to apparent contentment. This unsettling behavior raised concerns for Aguila, especially considering the sensitive and painful nature of the subject matter in relation to his Jewish heritage.

33. Following Hamann's remarks about her great-uncle's Nazi history, the teleconference became uncomfortable, leading to a notable reduction in Aguila's responses. Aguila reflected that Hamann's anti-Jewish comments were possibly fueled by resentment towards the recent complaint that Aguila had filed with Lange. Aguila remains uncertain about how Hamann discerned his role in the complaint. Aguila surmises that his evident dissatisfaction with the recent transfer to Hamann's team may have led her to suspect him as the complainant. This hypothesis is supported by Hamann's email dated February 14, 2023, where she implies a connection between Aguila and the compliance case conducted by Lange, investigating her behavior towards Schmid.

34. Given Hamann's previous conduct of recording Microsoft Teams meetings with Schmid, it is presumed that she may have also recorded the October 11, 2022, teleconference with Aguila. Should such a recording exist, Aguila intends to request a copy during the discovery phase of the legal process.

35. At the time, Aguila refrained from filing a complaint against Hamann regarding her pro-Nazi comments, primarily due to the absence of direct evidence from their private Microsoft Teams meeting. Aguila's decision not to file a complaint was also influenced by his diminished trust in the Philips Ethics Department. Aguila's skepticism arose from the department's lackluster response to his earlier complaint about Hamann's bullying behavior. The investigation into Aguila's previous complaint about Hamann concluded around November 14, 2022, without any disciplinary actions against Hamann, despite clear evidence of her breaching many company policies. This outcome intensified Aguila's concerns about the department's ineffectiveness and failure to maintain impartiality in addressing severe workplace misconduct.

**Unmasking a Fraud: Aguila Exposes Evans's Plagiarized Ph.D. Dissertation**

36. In his capacity as the appointed cybersecurity specialist for Philips's regulatory department, Aguila's responsibilities included verifying the authenticity of employee credentials for those accessing sensitive regulatory information and documents. This procedure aligns with best practices endorsed by leading cybersecurity-related organizations, including the National Institute of Standards & Technology (NIST), the Cybersecurity & Infrastructure Security Agency (CISA), and the Information Systems Audit & Control Association (ISACA). Hamann formally acknowledged this responsibility in an email dated January 20, 2023, where she requested Aguila's professional input, stating: "I would like to get your input on below as our [c]ybersecurity expert." Aguila's role as

the cybersecurity expert was crucial in safeguarding the integrity and legitimacy of high-level regulatory roles at Philips. His responsibilities were fundamental to maintaining robust access control, effectively mitigating internal risks, and ensuring adherence to ethical standards across Philips.

37. On December 15, 2022, as part of his duties as Philips's cybersecurity expert, Aguila discovered that Evans had plagiarized significant portions of his Ph.D. dissertation. This revelation underscored the importance of Aguila's role in maintaining the integrity and reputation of Philips's regulatory department and bolstering the company's overall cybersecurity posture. Addressing such ethical discrepancies is essential to prevent security risks linked to academic misconduct within the organization. Following this discovery, Aguila contacted Evans to schedule a meeting to discuss the issues concerning his academic integrity.

38. One particularly notable instance of plagiarism in Evans's Ph.D. dissertation, was a sentence copied directly from a 1996 journal article, into his 1997 Ph.D. dissertation. However, during the duplication process, Evans inadvertently introduced a grammatical error. In the original journal article, the sentence correctly used the phrase "their own," but in Evans's dissertation, it was mistakenly rewritten as "there own":

| Extract from Evans's 1997 Ph.D. dissertation | Extract from the copied 1996 journal article |
| --- | --- |
| "Type II receptors bind ligand on *there* own, whereas type I receptors bind ligand only when coexpressed with the corresponding type II receptors". (emphasis added). | "Type II receptors… bind ligand on *their* own, whereas *the* type I receptors bind ligand only when coexpressed with the corresponding type II receptors". (emphasis added). |

39. Following Aguila's uncovering of Evans's academic plagiarism, Evans delegated the matter to Matt Salada, a member of the Ethics Compliance Department for Philips NA, in Tennessee. Salada reached out to Aguila on December 21, 2022, to initiate an investigation of Evans's plagiarism based on Aguila's evidence. This inquiry concluded on January 13, 2023, with Salada writing that the plagiarism in Evans's Ph.D. dissertation from 1997 did not breach Philips's General Business Principles (GBPs). In his email to Aguila, Salada underscored the necessity for maintaining confidentiality about the plagiarism investigation, explicitly instructing Aguila to refrain from discussing or disclosing the investigation on Evans's plagiarism, with other Philips employees.

40. After the investigation, Aguila communicated his apprehensions to Salada about possibly facing retaliation from Evans for raising the plagiarism issue. Salada promptly responded, reiterating Philips's strong stance against retaliation for employees in ethics-related processes. He

emphasized the company's policy, which all employees agree to abide by as part of their employment. Salada further advised Aguila that if he experienced any form of retaliation related to his actions concerning Evans's plagiarism, then Aguila should immediately report such incidents to him.

41. In the aftermath of Salada's investigation regarding Evans's Ph.D. plagiarism, Evans reached out to Weiss, the HR director at Philips Boeblingen. Apparently, this marked the first instance of direct communication between Evans and Weiss. It is reasonable to assume that Evans's intent in reaching out to Weiss, was to initiate disciplinary action against Aguila. During a February 16, 2023, meeting, Weiss personally acknowledged to Aguila that he had engaged in discussions with Evans. These discussions with Weiss, were initiated by Evans, and centered around Aguila´s investigation into Evans's plagiarism. This meeting between Weiss and Aguila was officially documented in the minutes written by Sarah Rueckle, who also attended this meeting.

42. During this meeting, Weiss confirmed that he received the emails Aguila had sent to Evans on December 15, 2022, provided to him by Evans. These emails included the plagiarism report for Evans's Ph.D. dissertation, highlighting the gravity of Aguila's findings. Evans's proactive engagement with Weiss, focusing on the issue of Aguila's plagiarism investigation on his Ph.D. dissertation, diverged from Philips's standard protocols for confidential inquiries. It can be reasonably inferred that Evans's decision to discuss Aguila's plagiarism investigation, with Weiss as HR director, was motivated by a desire to retaliate against Aguila. This deviation from expected procedures highlights Evans's apparent efforts to influence the disciplinary process against Aguila, aiming to counteract the implications of Aguila's discovery of Evans's plagiarism.

43. Aguila asserts that Philips NA bears vicarious liability for the actions of its employee, Evans. This liability stems from Evans's conduct in reaching out to the HR department and forwarding to Weiss the plagiarism report prepared by Aguila, which pertains to Evans's academic misconduct. Aguila argues that these actions were carried out as part of Evans's employment with Philips NA.

44. In response to Aguila's concerns about Evans's inappropriate contact with the HR department, Aguila contacted Salada about this incident on February 21, 2023. However, Salada informed Aguila that he could not offer assistance in this situation and recommended Aguila seek support elsewhere for issues related to Evans's conduct. This response sharply contrasted Salada's earlier assurances, as conveyed in his January 13, 2023, email, where Salada had encouraged Aguila to report any instances of retaliation or misconduct by Evans to him.

**The February 10, 2023, Meeting between Hamann and Aguila**

45. On February 10, 2023, Mr. Aguila arranged a face-to-face meeting with Ms. Hamann at the Philips Boeblingen office, scheduled for 3:00 PM. This meeting was in a similar vein to Aguila's earlier effort to have a direct discussion with Mr. Evans on December 15, 2022. This meeting was convened to discuss the substantial plagiarism detected in Hamann's Ph.D. dissertation from the German Sport University in Cologne. Aguila chose this approach in light of Hamann's previous expression of betrayal on October 11, 2022. During this meeting, Aguila specifically focused on the extensive passages, copied word-for-word, from earlier doctoral theses, which were included in Hamann's Ph.D. dissertation without any attribution or citations.

46. Specifically, Aguila's investigation revealed that a considerable portion of Hamann's 2012 Ph.D. dissertation closely mirrored a 2010 Ph.D. dissertation from the University of Minnesota. This replication involved the content, intricate sentence structures, and specialized terminology, directly copied without acknowledgment from the original UM dissertation. This blatant academic misconduct raised doubts about Hamann's integrity and credibility. Moreover, like Evans's case, Hamann's act of plagiarism included a grammatical error. Hamann inadvertently introduced a mistake by omitting the em dash from the original dissertation and failing to replace it with an appropriate punctuation mark. Furthermore, there appeared to be a calculated attempt to circumvent plagiarism detection software. Hamann did this by altering the sequence of cited authors, for instance, reversing "Lanyon and Rubin" in the UM dissertation to "Rubin and Lanyon" in her dissertation. Such alterations are indicative of a conscious effort to evade detection:

| Extract from Hamann's 2012 dissertation | Extract from the 2010 UM dissertation |
| --- | --- |
| "***Rubin and Lanyon*** [87] were the first to demonstrate the importance of odd-impact loading on bone formation. They showed that altering the distribution of strain through artificial loading of the wing bones of turkeys resulted in greater formation of bone relative to the loading generated by the natural flapping of wings. This greater bone formation occurred despite the same peak strain magnitude and maximum strain rate during both the artificial and natural loading of the ***wings indicating*** that abnormal distribution of strain in bones is osteogenic." (emphasis added). | "***Lanyon and Rubin***[158] were the first to demonstrate the importance of odd-impact loading on bone formation. They showed that altering the distribution of strain through artificial loading of the wing bones of turkeys resulted in greater formation of bone relative to the loading generated by the natural flapping of wings. This greater bone formation occurred despite the same peak strain magnitude and maximum strain rate during both the artificial and natural loading of the ***wings—indicating*** that abnormal distribution of strain in bones is osteogenic." (emphasis added). |

47. Demonstrating his commitment to transparency and integrity, Aguila gave Hamann the plagiarism report he had prepared for her Ph.D. dissertation. This gesture underscored Aguila's dedication to maintaining open and honest communication, deliberately eschewing any hint of clandestine behavior in his approach. Since it was late on a Friday (the Boeblingen office typically quiets down early on Fridays), and their meeting ended at 3:30 PM, Aguila informed Hamann that he intended to report his findings to the Ethics Compliance Department on Monday, February 13, 2023. Aguila's approach aligned with proper protocols, ensuring Hamann was the first to know about the complaint, and avoiding discussions with colleagues about this issue. However, after their meeting, Hamann preemptively reached out to both Carlsson and Weiss, informing them about Aguila's investigation into her academic work. This action by Hamann seemed to be a step towards initiating the termination of Aguila's employment, apparently as a retaliatory measure in response to his investigation of her Ph.D. dissertation and his intended formal complaint.

48. The February 10, 2023, meeting between Aguila and Hamann marked their final conversation. Many subsequent developments, not based on Aguila's direct knowledge, are derived from an email that Hamann sent to Carlsson and Weiss on February 14, 2023, hereafter referred to as the "2/14 email."[2] Within this email, Hamann stated: *"I think already from this one can observe that **he planned well**"* (emphasis added). This remark unfortunately echoes the antisemitic stereotype of the "sneaky Jew," implying deceitful motives by Aguila. However, Aguila's actions aligned with his responsibilities as the sole cybersecurity expert in the regulatory department, focused on addressing academic integrity in Hamann's Ph.D. dissertation. Aguila's approach was wholly consistent with his professional and ethical duties, starkly contrasting with Hamann's unfounded suggestions of secretive planning. This defamatory assertion by Hamann appears to be an intentional effort to skew Carlsson's perception of Aguila's character and intentions.

49. Aguila's intention to report Hamann's academic plagiarism on February 13, 2023, was shaped by his previous experiences with Philips's handling of internal ethical issues. Notably, Hamann had earlier violated Philips policies by creating unauthorized screenshots of Microsoft Teams chats with Schmid and mocking him in front of the regulatory department. Despite these infractions, she faced no disciplinary action. Coupled with Aguila's prior encounter involving

---

[2] Aguila inadvertently came into possession of Hamann's 2/14 email due to an oversight by Philips's law firm, Schindhelm Pfisterer. The email was accidentally included in their February 21, 2023, request to the KVJS, thereby unintentionally revealing its contents to Aguila.

Evans's plagiarism case, where Salada wrote that plagiarism was not considered a violation of Philips's policies, Aguila believed that Hamann would not face any consequences. Aguila's intention to report Hamann's plagiarism stemmed from his commitment to his role as the only cybersecurity expert within the regulatory department. This action was taken not in anticipation of punitive measures from Philips against Hamann, but rather out of a professional obligation to uphold ethical standards in the workplace. Unexpectedly, Hamann responded by cutting off Aguila's access to Philips's electronic and physical infrastructure, while leveling accusations against him of intellectual property theft, sick leave fraud, and attempted blackmail.

**Hamann's Unfounded Claims of Aguila Stealing Philips's Intellectual Property**

50. On February 11, 2023, Hamann took decisive action against Aguila by instructing the Philips IT department to immediately revoke Aguila's access to essential company resources, as detailed in her 2/14 email. Hamann specifically requested the prompt removal of Aguila's access to the Philips email system, intranet system, and physical entry to the Philips Boeblingen office. Hamann´s order to the IT department, undertaken while Mr. Aguila was still an employee of Philips, significantly impaired his ability to fulfill his professional responsibilities.

51. While Hamann may contend that her discovery of Aguila's alleged IP theft just a day after their February 10, 2023, meeting was coincidental, the timing and nature of her response suggest otherwise. Her accusation of intellectual property theft against Aguila, particularly grave given his role as a cybersecurity expert, appears to be a deliberate act of retaliation. This allegation, aimed at a critical aspect of Aguila's professional integrity, was used to justify the revocation of his email and intranet access to Philips's IT department. By shifting the focus from Aguila's valid concerns about her Ph.D. plagiarism, to framing him as an IP thief, Hamann sought not just to discredit Aguila but to severely damage his career at Philips. Considering Aguila's specialized role, the accusation's severity would necessitate swift action from the IT department, indicating Hamann's calculated use of this charge as a potent weapon of retribution against Aguila.

52. During a telephone conversation on February 14, 2023, with the Philips worker's council, Aguila learned of Hamann's accusation against him. The council members involved in this call, namely Roland Schmid, Antje Banz, and Andreas Schlack, conveyed Hamann's claim of intellectual property theft. However, the accusation of IP theft leveled by Hamann, lacked substantive backing. For example, Aguila only had access at Philips to regulatory documentation, a realm

distinct from the sensitive areas of intellectual property such as the IntelliVue software code. This discrepancy casts significant doubt on the validity of Hamann's claim. The absence of concrete evidence to support Hamann's allegation of IP theft, undermines its credibility and suggests it may have been driven more by a desire for retaliation than factual concerns.

53. By Sunday, February 12, 2023, the IT department fully executed Hamann's directive to remove Aguila's access to Philips's email and intranet systems. As recorded in Hamann's 2/14 email, this action effectively cutting Aguila off from essential communication and work resources at Philips. Hamman specifically wrote the following in her 2/14 email:

> "Feb 11 evening: Nina triggers IT to remove digital accesses (Code l,
> Outlook, Teams, etc) from Ralph
> Feb 12 morning: Nina finishes with IT removal of digital accesses"

54. Consequently, Aguila found himself unable to log in and proceed with his intended complaint to the Philips Ethics Department, initially planned for February 13, 2023. Aguila's lockout appears to have been a reactionary response from Hamann, likely fueled by her resentment towards Aguila for exposing plagiarism in her Ph.D. dissertation. The involvement of Aguila, who is Jewish, in this exposure, might have intensified Hamann's retaliatory response, underscoring the influence of personal prejudices on professional decisions within the workplace.

55. Philips's standard protocols typically require that before removing an employee's digital access, the individual in question should first undergo an interview with the Ethics Compliance department. This procedure ensures a fair and transparent approach to addressing any concerns. In Aguila's case, however, this normative process was overlooked. Hamann presented Aguila's supposed involvement in intellectual property theft as an immediate crisis, effectively bypassing the prerequisite of an initial interview. Portrayed as an urgent matter to avert potential IP theft during the weekend of February 11-12, 2023, this approach subverted the usual procedural safeguards. It appears, though, that the true urgency for Hamann was to preclude Aguila from lodging his plagiarism complaint against her by Monday, February 13, 2023, using the allegation of IP theft as a tactical diversion for her objectives.

**The February 14, 2023, Email from Hamann to Carlsson**

56. Notably absent in Hamann's 2/14 email, is any mention of her earlier accusation, made on February 11, 2023, alleging Aguila's theft of Philips's intellectual property, a charge she had

previously reported to the IT department. Instead, she shifts focus to alleging sick leave fraud and introducing a new blackmail claim. Hamann wrote, "I felt a massive overstep into my privacy by having spied out [the] content of my Ph.D. dissertation and at the same time used to blackmailing me for his personal interest." However, she provided no specifics on how Aguila purportedly attempted to blackmail her. This lack of detail in Hamann's accusation raises questions about the veracity and motive behind the claim, especially considering the absence of any explanation or evidence to support the alleged blackmail.

57. In her 2/14 email to Carlsson, Hamann made a notable claim: "Oct 12: Ralphs [sic] sends in home office injury notification for incident happened on Oct 12 but puts sick leave for cold/flu for Oct 12/13 in place. Can that be considered fraud?". This statement was misleading as Hamann knew that Aguila had provided her with legitimate sick leave documentation for October 12, 2022. On that date, Aguila received a signed sick leave note from his doctor, Dr. Ann-Karin Fesseler, which he promptly scanned and forwarded to Hamann. However, Carlsson, unaware of this fact due to Hamann omitting it in her communication, could have mistakenly believed Aguila's sick leave to be fraudulent.

58. Hamann could have easily verified the authenticity of the sick leave notes by contacting Dr. Fesseler, whose contact details were on the note. Instead, by casting aspersions on Aguila's integrity in her communication with Carlsson, Hamann seemingly aimed to build a case for Aguila's termination. Without the independent authority to terminate Aguila's employment, Hamann sought to cast Aguila in a negative light to Carlsson, who held the authority to order Aguila's dismissal. This approach mirrored her previous action of directing the IT department to revoke Aguila's digital access based on false information.

59. Aguila contends that Philips Boeblingen is vicariously liable for the actions of its employee, Hamann, as her conduct in sending the defamatory email falls within the ambit of her employment. The particularly egregious nature of the allegations made by Hamann, especially in light of the available evidence validating Aguila's illness on October 12, 2022, exacerbates the defamatory impact of her communication to Carlsson.

60. It is significant to note that Hamann's 2/14 email, was addressed to her supervisor, Carlsson, who is based in Minnesota and operates from her home office as the "Head of Regulatory Affairs" for Philips, a position she has held since October 2021. Carlsson's responsibilities encompass overseeing Philips regulatory teams across various regions, including the U.S., Germany,

China, and additional locations. Within this structure, Hamann directly reports to Carlsson. This hierarchical relationship underscores the professional context in which Hamann communicated her allegations against Aguila.

61. Importantly, Hamann's 2/14 email concludes with the following request to Carlsson and Weiss: "[l]et me know if I do need to revise anything." This remark is peculiar, given that this email purports to be a factual, first-hand account of her meeting with Aguila on February 10, 2023. It is unclear how Carlsson or Weiss, who were not present at the meeting, could offer revisions to Hamann's "memory minutes." Hamann's solicitation for feedback on potential alterations to her narrative from Carlsson and Weiss, both senior Philips managers, raises questions about her commitment to factual accuracy. Hamann's readiness to modify her account, possibly to enhance its persuasiveness or credibility, blurs the line between a genuine recounting of events and a narrative tailored for strategic purposes. This willingness to adapt her story suggests a manipulative intent and casts doubt on the reliability and integrity of Hamann's statements.

**Pattern of Retaliation by Carlsson, Evans, and Hamann**

62. In August 2022, Carlsson's decision to reassign Aguila from the vital NPI group to a less significant role under Hamann appeared to be a retaliatory move. This reassignment, seemingly in response to Aguila's persistent advocacy for addressing the safety flaw in older IntelliVue models, occurred despite his demonstrated expertise in regulatory submissions for the U.S. and Canada. Aguila's reassignment, following his vocal disagreement with Philips's decision to not remediate the flaw in older models, indicates a punitive response to his commitment to patient safety. This move, contrary to the recommendations of Aguila's colleagues in the NPI group, detrimentally impacted the efficiency of the NPI group. The decision caused delays in vital regulatory submissions and indicated Carlsson's preference for disciplinary measures over the operational needs of the NPI group.

63. Evans's retaliation is evident in his communications with Philips Boeblingen's HR department regarding Aguila's investigation into Evans's plagiarism, which was corroborated by the official meeting minutes from a February 16, 2023, conference between Aguila and Weiss.

64. Hamann's retaliation against Aguila was complex and multi-layered. It began with her antisemitic remarks on October 11, 2022, a day after Lange informed her of a complaint against her for unauthorized chat screenshotting and bullying of Schmid. The retaliation intensified after

Aguila challenged Hamann about the plagiarism in her Ph.D. dissertation on February 10, 2023. Subsequently, Hamann intensified her retaliatory measures by filing a complaint with Carlsson and Weiss. In this complaint, she accused Aguila of engaging in sick leave fraud and blackmail, and further alleged that Aguila had orchestrated a well-calculated conspiracy against her.

65. Aguila believes that Philips was responsible for ensuring that their employees, such as Carlson, Evans, and Hamann, were adequately supervised and verifying that their conduct was appropriate. However, Philips did not uphold this responsibility, leading to an environment where unethical and discriminatory behavior was allowed to continue, negatively affecting Aguila.

**Philips's Original Termination Attempt: Accusing Aguila of Blackmail and Sick Leave Fraud**

66. On February 21, 2023, Philips requested "KVJS",[3] a German governmental agency, to seek their permission to terminate Aguila's employment. In their request, Philips alleged that during the February 10, 2023, meeting, Aguila had attempted to pressure Hamann to promote him to the "NPI" manager role. Philips claimed Aguila threatened to reveal Hamann's plagiarism to her peers, jeopardizing her professional reputation unless she acceded to his request. It is crucial to note that Philips subsequently withdrew these allegations by withdrawing their request on October 11, 2023.

67. On March 24, 2023, Aguila countered Philips's accusations with six key arguments:

   a. Lack of evidence: Aguila highlighted that Philips's claim rests solely on Hamann's testimony. Given the well-documented problems that Hamann had with Aguila, he emphasized the likelihood of her testimony being influenced by retaliation, casting doubt on its objectivity and reliability as the sole evidence.

   b. Promotion Authority: Aguila pointed out that as a line manager, Hamann lacked the authority to promote him to the "NPI" manager position. Additionally, any such promotion would require approval from Evans, who, given Aguila's recent discovery of Evans's plagiarism, would likely oppose Aguila's advancement.

   c. Managerial Hierarchy: Carlsson was already the manager of the NPI group. Given this significant responsibility, it seems implausible that Hamann could persuade Carlsson to relinquish this crucial position in favor of Aguila. Especially considering Carlsson's prior decision to transfer Aguila out of the NPI team, as such a reversal would not only

---

[3] KVJS is an acronym for "Kommunalverband für Jugend und Soziales," a German term that, when translated into English, means Municipal Association for Youth and Social Affairs.

undermine her earlier judgment, but also potentially lead to embarrassment, casting doubt on her managerial decisions.

d.  Privacy and Professional Conduct: Aguila argued that disclosing Hamann's plagiarism to her colleagues at Philips would have constituted a breach of her privacy and led to disciplinary actions against him, negating the possibility of using this information for blackmail.

e.  Hamann's Response: Hamann's immediate disclosure to Carlsson and Weiss about Aguila's investigation into her Ph.D. dissertation, suggested she was not concerned about her plagiarism being public knowledge, undermining the claim that Aguila could have used this information for blackmail.

f.  Philips's Hiring Freeze: Aguila emphasized that due to substantial financial losses stemming from a ventilator recall, Philips had implemented a strict hiring and transfer freeze. This policy prohibited departments from replacing employees, including managers, who retired or departed the company, thereby making Aguila's purported demand for a promotion even more implausible.

68. On April 19, 2023, Philips offered a somewhat perplexing response:

> "The fact that Ms. Hamann herself cannot hire for the position of NPI manager is irrelevant according to this view. Ms Hamann reports directly to Ms Carlsson, who could have arguably awarded the post. If Ms. Hamann had recommended Mr. Aguila, his chances of getting the job would have increased. Mr. Aguila explicitly asked Ms. Hamann to recommend him for the position with Ms. Carlsson. … Apparently, there was also a need to have an advocate because, as Mr. Aguila himself states on page 13 of his statement, he did not assume that Mr. Evans wanted to see him in a leadership role in the NPI."

69. Deciphering this narrative, Philips appears to insinuate that Aguila orchestrated a rather elaborate scheme. This supposed strategy entailed pressuring Hamann to facilitate Carlsson's departure as NPI manager, paving the way for Aguila's ascension. Additionally, Hamann was purportedly tasked with convincing Evans to disregard Aguila's findings regarding his plagiarized Ph.D. dissertation.

70. Moreover, Carlsson's evident disdain for Aguila, primarily due to his persistent advocacy for rectifying the lethal flaw in all IntelliVue monitors – a defect responsible for at least 20 fatalities

– further complicates the scenario. This underlying animosity was a significant factor in Aguila's removal from the NPI group in August 2022. Consequently, the notion that Carlsson would facilitate Aguila's ascent to replace her as NPI manager appears highly improbable.

71. In their April 19, 2023, response to KVJS, Philips contended, "Hamann was aware that a compliance case had been initiated against her, but she did not know who the complainant was." This assertion implies Hamann lacked the motive for retaliation against Aguila, as she supposedly did not recognize his role in instigating the October 10, 2022, investigation. However, this claim seems questionable considering Hamann's 2/14 email, which notably includes a reference to receiving an invitation to a "compliance case" on October 10, 2022. Given the 2/14 email's exclusive focus on Aguila, coupled with the mention of the compliance case against her in this email, it is highly indicative that Hamann was indeed cognizant of Aguila's involvement in initiating the investigation, casting doubt on Philips's assertion of her ignorance. However, the upcoming document discovery phase will illuminate the veracity of Philips's assertion about Hamann's purported lack of knowledge regarding Aguila's role as the complainant in her October 10, 2022, ethics compliance case.

72. When KVJS did not accept Philips's allegations of Aguila's alleged blackmail against Hamann, Philips ultimately withdrew their request to KVJS on October 11, 2023.

**Philips's Second Termination Attempt: Accusing Aguila of Fabricating Antisemitism**

73. By June 2023, frustrated with the KVJS's refusal to approve Aguila's termination based on the alleged blackmail of Hamann, Philips adapted their strategy. They sought to dismiss Aguila on accusations of fabricating Hamann's antisemitic comments on October 11, 2022. In their new application to KVJS dated June 30, 2022, Philips gave a new reason for seeking Aguila's termination:

> "Ms. Hamann was questioned on 22.06.2023 by Ms. Zhang, an employee of the personnel department, about whether she was aware of being related to an SS officer named Joachim Hamann. Ms. Hamann credibly stated that she had no knowledge of whether she was related to SS officer Joachim Hamann. She explicitly did not rule out the possibility that there was a relationship. She didn't know."
>
> …
>
> "From our point of view, Ms. Hamann has credibly and comprehensibly described that she neither knew the SS officer Joachim Hamann by name nor knew anything about his deeds. She reacted indignantly to the accusation that she had boasted about the notorious Holocaust perpetrator and directly

showed that she maintains friendships with Jews and explicitly distances herself from the Nazi atrocities at all times.

It can be assumed that Mr. Aguila used the time of his leave of absence for an extensive Google search about Ms. Hamann and came across the Wikipedia article describing the Holocaust perpetrator Joachim Hamann. In the end, the surname is the only connecting element between Ms. Hamann and Joachim Hamann. The fact that Joachim Hamann is the ancestor of Nina Hamann is not even remotely proven.

It is clear to the employer that Nina Hamann did not "brag" to Mr. Aguila about the SS officer and Holocaust perpetrator Joachim Hamann.

According to this view, the allegation that Nina Hamann boasted about a Holocaust perpetrator is an untrue statement of fact that is capable and intended to make Ms. Hamann contemptuous. This is to be regarded as slander or slander against Ms. Hamann. For Mr. Aguila, the focus is exclusively on defaming the person of Ms. Hamann.

From our point of view, a trusting cooperation is no longer possible."

74. Philips's method of addressing the October 11, 2022, incident, involving Hamann's anti-Jewish remarks to Aguila, raises concerns about their investigative methods and decision-making. Notably, Weiss, who was responsible for the February 2023 interview with Hamann regarding the alleged blackmail by Aguila, refrained from interviewing Hamann directly about the October 11, 2022, incident. Instead, Weiss delegated this task to Haitong Zhang, a junior employee still within her probation period at Philips Boeblingen, assigning her the responsibility of conducting the official interview with Hamann on June 22, 2023. Zhang's key role involved assessing the veracity of Hamann's denial of making the pro-Nazi remarks to Aguila on October 11, 2022.

75. Philips's failure to similarly interview Aguila about Hamann's pro-Nazi comments reveals an inconsistency in their investigative approach to these serious allegations. This apparent one-sidedness hints at a bias within their procedures, highlighted by the fact that Aguila was not afforded an equal chance to provide his perspective.

76. The choice of Zhang, the sole non-German member of the HR department, for conducting the interview and assessing Hamann's denial of anti-Jewish remarks on June 22, 2023, is noteworthy. Zhang, still within her probationary period at Philips Boeblingen,[4] faced the vulnerability of

---

[4] Zhang only started working at Philips Boeblingen in February 2023. Because the probationary period is 6-months, Zhang's probationary period would only have ended in August 2023, which is several weeks after her interview with Hamann on June 22, 2023.

summary dismissal for any reason, suggesting potential pressure to align with the company's preferred narrative. This situation might have influenced Zhang's impartiality in evaluating Hamann's statements, potentially skewing her assessment towards Philips's preferences rather than an unbiased evaluation. Additionally, the contrast between Zhang's limited involvement in the case and Weiss's more extensive participation raises concerns about whether Zhang's race and junior position factored into Weiss's decision to entrust her with this critical and sensitive responsibility.

77. Weiss's conspicuous absence from the pivotal June 22, 2023 interview of Hamann raises questions about the fairness and impartiality of the process, especially considering his significant role, alongside Dieter Haase, in Aguila's termination on August 30, 2023. Aguila, a Jewish employee, was dismissed on grounds of allegedly fabricating Hamann's antisemitic remarks. Despite his considerable influence in Aguila's case, Weiss's decision to not partake in this crucial interview suggests a possible attempt to distance himself from a potentially controversial or biased decision, relying instead on the Zhang's subjective evaluation of Hamann's credibility.

78. Aguila had no motive to fabricate Hamann's antisemitic remarks from October 11, 2022. He followed Philips's protocols, filing a complaint against Hamann and maintaining confidentiality among her colleagues, thus respecting Hamann's privacy.

79. Aguila's formal HR complaint, filed on June 21, 2023, was in response to a June 19, 2023, email from Weiss, who inappropriately addressed him as "herr Aguial." In German culture, using the lowercase "herr" instead of the proper "Herr" (which translates to "Mister"), is seen as a significant sign of disrespect. This incorrect form of address, combined with the misspelling of Aguila's name, was interpreted by Aguila as an intentional act of disrespect and a display of Weiss's underlying contempt of Aguila.

80. Weiss significantly deviated from Philips's standard procedures by not having Lange from the Ethics Compliance office involved in Hamann's interview, a choice that could have ensured a more impartial perspective. This deviation is particularly concerning given the HR department's apparent eagerness to find reasons for Aguila's termination, indicating possible bias.

81. Aguila was not only dismissed by Philips on August 30, 2023, but his employment was terminated for cause (i.e., without a notice period), disqualifying him from collecting unemployment insurance for the initial three months. Despite repeated requests from the unemployment agency for the specific reason behind Aguila's termination for cause, Philips has consistently declined to respond. Consequently, due to Philips's non-compliance with legal directives, the

unemployment agency informed Aguila on December 4, 2023, that Philips would face a fine from them for failing to adhere to the law requiring disclosure of the exact reasons for Aguila's layoff.

82. Lastly, Philips's unfair treatment of Aguila is further evidenced by the conduct of the workers' council. This body is tasked with voting on requests for employment terminations by the company. On June 30, 2023, a Friday, the council emailed Aguila at 5:21 PM, requesting a discussion about Philips's decision to terminate Aguila regarding their disbelief about Hamann's antisemitic statements. The council set a strict response deadline of "Monday morning", July 3, 2023. Aguila, however, only saw the email after the deadline, missing the chance to present his case to the council before they voted. Before receiving this email, Aguila was unaware of Philips's intentions to terminate his employment, based on their belief that he had been untruthful about Hamann's anti-Jewish remarks. This instance of giving an unreasonably short response time is indicative of the broader pattern of biased treatment that Aguila experienced at Philips.

83. Aguila experienced further discriminatory behavior from the workers' council, particularly from member Roland Schmid, who sent an email on February 22, 2023, stating, "blonde [h]air will help you." Aguila interpreted this as a veiled suggestion that his Jewish heritage, contrasted with the stereotypical German appearance of blonde hair, was a factor in the mistreatment he faced at Philips Boeblingen. While Roland Schmid's comment could potentially be attributed to his limited English proficiency, its implications were clear to Aguila. Moreover, the council's action of sending Aguila an email after 5 PM on a Friday, demanding a response before noon on the following Monday, highlights an unfair and possibly discriminatory treatment. Such a rushed timeframe seems unreasonable, raising doubts about whether the council would have imposed similar conditions on non-Jewish employees.

**KVJS's Startling Decision: Equating Aguila's Antisemitism Concerns to Criminal Behavior**

84. The KVJS, in its August 24, 2023 decision,[5] specified that they only authorize an employer to terminate an employee if the employee's actions constitute "serious breaches of contractual obligations, akin to intentional criminal acts." Interestingly, KVJS's decision to allow Philips to terminate Aguila's employment was not based on Philips's accusation of Aguila lying about Hamann's

---

[5] The August 24, 2023, decision by KVJS, allowing Philips to terminate Aguila's employment as per their request dated June 30, 2023, is not yet final as it is currently under appeal.

pro-Nazi statements. Instead, KVJS based its approval for Philips's request on a different reason, as they wrote:

> "Mr. Aguila, in his statement to the KVJS, inter alia, in connection with the relationship of [Ms. Hamann] with an SS officer, [where she] argues that she has no knowledge of a degree of kinship, [Aguila wrote that] a reasonable person would probably be motivated to ask whether they are directly related to a Nazi war criminal. According to Mr. Aguila, Ms. Hamann's supposed lack of curiosity about this connection raises questions about her credibility and intentions, which is a very disrespectful attitude towards his superiors."

85. Essentially, KVJS, a German government agency headed by Gerhard Bauer, equated Aguila's inquiries into Hamann's indifference about her relation to Joachim Hamann (as reported in Zhang's June 22, 2023 interview) to a criminal act. This interpretation by KVJS seems as perplexing as the rationale behind it. Notably, KVJS did not address whether Hamann's pro-Nazi statements to Aguila, a Jewish individual, were disrespectful. The existence of undisclosed communications between Philips and KVJS, from which Aguila was excluded, presents significant concerns. The anticipated document discovery in Aguila's lawsuit is likely to shed light on the nature and implications of these interactions, potentially impacting the case.

86. The decision made by KVJS, an important agency within the German government, carries profound societal implications, especially given its apparent antisemitic undertones. This extends far beyond the confines of Aguila's situation, potentially affecting public confidence in the German government's commitment to impartiality and justice, especially regarding issues of antisemitism. KVJS's outcome could discourage individuals from reporting similar issues, concerned about the seriousness with which government agencies treat complaints about antisemitism. Consequently, KVJS's decision poses broader questions about the commitment of German governmental agencies to maintaining equality and impartiality, and its ramifications on the never-ending struggle against antisemitism in Germany.

**Philips States That Aguila Was Not "Jewish Enough" for Recognition**

87. In its August 24, 2023, decision, the KVJS explicitly acknowledged that Aguila is Jewish, stating, "[h]e sees this story by Ms. Hamann as an attempt to ridicule his Jewish ancestry." Contrarily, at a November 2, 2023, court hearing, Philips's lawyers, Beate Lohrmann-Stallecker and

Sandra Steur, claimed that Philips was unaware of Aguila's Jewish identity before his dismissal on August 30, 2023, despite this fact being clearly stated in KVJS's decision. Lohrmann-Stallecker suggested Aguila had not sufficiently made his Jewish identity known at Philips, citing his wearing of a yarmulke during the hearing as potentially misleading. Weiss, also present at the hearing, echoed this sentiment.

88. Philips's claim carries troubling legal and ethical implications, suggesting a stereotypical viewpoint that Jewish individuals must adhere to specific visible markers of identity. This stance promotes a restrictive and potentially discriminatory perception of Jewish identity, reflecting a concerning bias. The implication that Jewish employees need to conspicuously display their religious identity to be recognized unfairly singles out Jewish individuals. Lohrmann-Stallecker and Weiss's insinuation disturbingly mirrors historical mandates where Jews were forced to wear distinct symbols. Aguila poignantly countered this by rhetorically asking if Philips expected him to wear a distinctive symbol like a yellow Star of David to unmistakably signify his Jewish identity at work.

89. Philips's approach challenges Aguila's personal expression and autonomy, promoting a narrow, standardized view of Jewish identity. This risks creating a hostile work environment for Jewish employees at Philips, who may feel compelled to display their identity in specific ways for validation. By placing the burden on Aguila to make his Jewishness more visible, Philips shifts the focus from their responsibility to cultivate an inclusive environment. This stance not only unfairly blames Aguila for any misunderstandings or negative experiences related to his faith at Philips, but also amounts to a subtle form of derogation, implying that Jewish identity is less legitimate unless it adheres to external stereotypes.

## DAMAGES

90. Aguila has sustained considerable economic harm due to Hamann's defamatory email, evidenced by Philips's decision to terminate his employment at Philips Boeblingen. This termination process began with the misleading and damaging assertions in Hamann's email dated February 14, 2023, which wrongfully accused Aguila of blackmail and sick leave fraud. Aguila's annual salary at Philips was 115,586 Euros, equivalent to $124,527 based on the December 10, 2023, exchange rate. Anticipating continued employment until age 65, about 19 more years, his total projected loss in earnings is $2,366,013. This estimate assumes ongoing employment at his current salary,

excluding potential salary increases, promotions, or exchange rate fluctuations, and encapsulates the economic impact of the wrongful termination instigated by the defamatory email.

91. The distress caused by Hamann's false allegations and the subsequent termination decision that Carlsson participated in, compounded by Philips's later withdrawal of Hamann's initial claims on October 11, 2023, has inflicted severe mental anguish on Aguila. This anguish is reflected in his professional and personal life due to the tarnished reputation and the challenge of securing equivalent employment in a field where integrity is crucial. Consequently, a damage multiplier of 3, applied to his economic damages, suggests compensation for Aguila's non-economic damages, including mental suffering and distress, should be approximately $7,098,039. This amount recognizes the profound and lasting personal and professional repercussions faced by Aguila as a result of the defamatory actions and their subsequent withdrawal by Philips.

92. Furthermore, Aguila has experienced significant mental anguish and emotional trauma as a direct result of the antisemitic behavior and attitudes exhibited by Philips's employees and agents. Philips's apparent tolerance of antisemitism has compounded this distress. The instances of overt antisemitism, including derogatory remarks and subtle microaggressions, have not only profoundly affected Aguila's psychological well-being, but also his sense of security and belonging within the workplace. The cumulative effect of these incidents, which include being subjected to mockery of his Jewish heritage and the insinuation that he needed to make his Jewish identity more apparent, has led to a profound sense of isolation, anxiety, and stress. The impact of this sustained exposure to a hostile work environment, rife with antisemitic undertones, cannot be overstated. It has inflicted a heavy emotional toll on Aguila, for which he seeks appropriate compensation in this lawsuit.

93. The aggregate sum of the economic and non-economic damages, amounts to a total of $9,464,052. This figure represents a comprehensive assessment of the financial loss and emotional distress suffered, pursuant to the legal claims presented in this case.

## FIRST CLAIM FOR RELIEF
### Violation of the Minnesota Whistleblower Act

94. The Plaintiff reasserts and incorporates by reference paragraphs 1 through 93 of this complaint as if fully detailed herein.

95. This claim is brought under the Minnesota Whistleblower Act (Minn. Stat. § 181.932), which prohibits employers from retaliating against employees who report in good faith a suspected violation of any federal or state law or rule adopted pursuant to law.

96. Aguila engaged in protected whistleblowing activities by reporting to his manager, Philips Ethics Department, or HR department about various unethical practices, including but not limited to, the handling of systemic defects in IntelliVue patient monitors that have led to the deaths of at least 20 patients, antisemitic statements by Aguila's manager, and incidents involving academic plagiarism.

97. Subsequent to these reports, the Plaintiff experienced adverse employment actions, including but not limited to reassignment to a less prestigious department, the creation of a hostile work environment, and his wrongful termination. The Defendants took these actions as a direct response to the Plaintiff's whistleblowing activities.

98. The Plaintiff's reports to the Philips Ethics Department and HR Department were made in good faith and concerned matters of public importance, including patient safety and academic integrity, which are protected under the Minnesota Whistleblower Act.

99. The adverse actions taken against the Plaintiff, including his termination, are a direct violation of the Minnesota Whistleblower Act, as they were retaliatory and intended to penalize the Plaintiff for his protected conduct.

## SECOND CLAIM FOR RELIEF
### Retaliation (Based on Common Law)

100. The Plaintiff reasserts and incorporates by reference paragraphs 1 through 93 of this complaint as if fully detailed herein.

101. This claim is predicated on the common law doctrine of civil retaliation as recognized in Minnesota. On September 29, 2022, Aguila filed a complaint with the Philips Ethics Department concerning Hamann's conduct, particularly her bullying behavior towards a colleague. In response to this complaint and the ensuing investigation, which began on October 10, 2022, Hamann initiated a series of actions that exemplify retaliatory behavior as defined under Minnesota law.

102. Specifically, starting on October 11, 2022, Hamann exhibited antisemitic behavior and made derogatory references to her familial connection with her great-uncle, Joachim Hamann, who was an infamous SS officer during World War II, in a manner aimed to disparage Aguila. This

behavior escalated following Aguila's exposure of plagiarism in Hamann's Ph.D. dissertation on February 10, 2023. In retaliation, Hamann sent a defamatory email on February 14, 2023, to Carlsson in Minnesota and Weiss in Philips Boeblingen's HR department, containing knowingly false accusations against Aguila.

103.  Concurrently, Evans engaged in communications with Weiss around the same time, contravening explicit instructions by Salada on the confidentiality of Aguila's investigation on his plagiarism. The timing of these actions, coinciding with Hamann's retaliatory behavior, indicates a potential coordinated effort to retaliate against Aguila for his activities.

104.  The cumulative effect of these actions, which include Hamann's dissemination of false information, has resulted in significant harm to Aguila. This encompasses wrongful termination, severe emotional distress, reputational damage, and contribution to a hostile work environment. Such actions illustrate a pattern of retaliation within Philips against employees simply doing their job, contrary to the principles of fair and ethical workplace practices as upheld in Minnesota.

105.  Under Minnesota law, retaliation against an employee for engaging in protected activities is prohibited. The actions taken against Aguila following his ethical reporting violate this principle. The orchestrated nature of the retaliation, involving multiple individuals within the organization, demonstrates a systemic issue within Philips that goes against the state's legal protections for employees.

## THIRD CLAIM FOR RELIEF
### Violation of Civil Rights Under the Minnesota Human Rights Act

106.  The Plaintiff reasserts and incorporates by reference paragraphs 1 through 93 of this complaint as if fully detailed herein.

<u>Allegations of Discriminatory Conduct:</u>

107.  Aguila alleges that Philips Boeblingen and Philips NA engaged in actions that violated his civil rights as protected under the Minnesota Human Rights Act (Minn. Stat. § 363A.08).

108.  Aguila avers that during his employment, he was subjected to discriminatory treatment based on his Jewish heritage, which is protected under the MHRA as a form of religious discrimination. This includes, but is not limited to, the following incidents:

- Remarks made by Hamann on October 11, 2022, praising her great-uncle's association with the SS and actions during World War II, which Aguila perceived as an attempt to ridicule or demean his Jewish heritage.
- A pattern of behavior that Aguila contends created a hostile work environment, including but not limited to the aforementioned remarks and other instances of differential treatment based on his religious identity.

109.  Aguila asserts that these actions by Philips employees, particularly those in positions of authority, reflect a workplace culture that tolerates and possibly endorses discriminatory behavior, contributing to a hostile work environment that directly violates the MHRA.

Direct Impact on the Plaintiff:

110.  The alleged discriminatory conduct directly impacted the Plaintiff's employment conditions, leading to a work environment that was hostile, intimidating, and offensive, thereby affecting his ability to perform his job duties effectively.

111.  Aguila contends that this treatment played a significant role in the eventual termination of his employment, which he believes was unjust and motivated, at least in part, by discriminatory animus against his Jewish heritage.

Negligent Supervision:

112.  The Defendants had a duty to exercise reasonable care in supervising and retaining their employees, including Carlson, Evans, and Hamann. The Defendants failed to fulfill this duty by allowing an environment where unethical and potentially discriminatory conduct could occur and persist, directly impacting Aguila.

113.  The Defendants' failure to supervise effectively and address the problematic behaviors of their employees, as detailed in the preceding paragraphs, constitutes negligent supervision. This lack of oversight provided the conditions for the Plaintiff's defamation, retaliation, and emotional distress.

114.  Under the vicarious liability doctrine, the Defendants are responsible for their employees' actions. The discriminatory and harassing behaviors, and the retaliatory actions taken against Aguila, indicate a broader failure by the Defendants to adhere to the standards set forth by the MHRA.

115.  As a direct result of the Defendants' negligent supervision and violation of the MHRA, the Plaintiff suffered significant damages, including emotional distress, harm to his professional reputation, and economic losses.

## FOURTH CLAIM FOR RELIEF
### Defamation (Based on Common Law)

116.  The Plaintiff reasserts and incorporates by reference paragraphs 1 through 93 of this complaint as if fully detailed herein.

117.  The Plaintiff, Aguila, is a former employee of Philips Boeblingen. Hamann, is a current employee of Defendant Philips Boeblingen, and acted in her professional capacity during the incidents in question.

118.  On February 14, 2023, Hamann sent an email to Carlsson, a Philips NA manager based in Minnesota, containing defamatory statements about Aguila. These statements falsely accused Aguila of blackmail and sick leave fraud, which were unfounded and made without any factual basis. This claim is predicated on the common law doctrine of civil defamation as recognized in Minnesota.

119.  The defamatory statements were communicated to Carlsson via email, a written and published format. This facilitated the widespread dissemination of these false allegations within the professional community of Philips, satisfying the publication requirement for a defamation claim.

120.  The libelous nature of Hamann's email dated February 14, 2023, is evident. The email deliberately and falsely attributed behaviors to Aguila that impugned his professional competence, exposed him to public ridicule, and significantly damaged his reputation, fulfilling the harm requirement for a defamation claim.

121.  In her role as a Philips Boeblingen employee, Hamann exhibited gross negligence, or actual malice, by making these false statements. Given the absence of a factual foundation for her accusations and the professional context of her actions, this behavior constitutes a fault amounting to at least negligence, aligning with the legal standards for defamation in Minnesota.

122.  As a direct consequence of Hamann's defamatory statements, Aguila suffered considerable harm to his reputation within Philips and the wider professional community. This harm has resulted in concrete damages, including wrongful termination, reduced professional opportunities, and severe emotional distress.

123. Minnesota law recognizes that defamatory statements causing harm to an individual's personal and professional reputation can constitute grounds for a civil defamation claim. In line with this legal precedent, Hamann's false and damaging statements against Aguila meet the criteria for actionable defamation.

## FIFTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress (Based on Common Law)

124. The Plaintiff reasserts and incorporates by reference paragraphs 1 through 93 of this complaint as if fully detailed herein.

125. On February 14, 2023, Hamann, in her capacity as an employee of Philips, composed and sent a defamatory email to Carlsson, a Minnesota-based manager at Philips. This email contained false and malicious accusations of blackmail and sick leave fraud against Aguila, leading to his wrongful termination. These baseless allegations were subsequently retracted by Philips on October 11, 2023, underscoring their unfounded nature.

126. Further compounding the egregious nature of Hamann's conduct is evidence of her expressing antisemitic sentiments, notably in praising her Nazi great-uncle. Such expressions, indicative of deep-seated prejudice, elevate the extreme and outrageous nature of her actions, especially considering the defamatory content was directed at Aguila, who is of Jewish descent.

127. This claim is predicated on the common law doctrine of Intentional Infliction of Emotional Distress (IIED), as recognized in Minnesota. The Defendant's conduct, particularly the fabrication and dissemination of false, injurious, and prejudiced statements, was either intentionally directed at causing Aguila emotional distress or carried out with reckless disregard for the high likelihood of such distress occurring, thus satisfying the intent element of IIED.

128. The nature and context of Hamann's conduct, coupled with her antisemitic expressions and Philips's legal team's insensitivity, were extreme and outrageous. Her actions, underlined by a clear bias, were so egregious and beyond the limits of civilized decency that they can be characterized as atrocious and utterly intolerable in a civilized society, thus meeting the extreme and outrageous conduct requirement for IIED.

129. The causation linking Hamann's actions and Aguila's emotional distress is direct and clear. Her conduct, amplified by her antisemitic views and the company's insensitive legal response, was the primary factor leading to Aguila's wrongful termination, professional disgrace,

public humiliation, and subsequent severe emotional distress, thus satisfying the causation element of IIED.

130. As a direct and foreseeable consequence of Hamann's conduct and the company's response, Aguila suffered severe emotional distress, manifesting as intense anxiety, debilitating stress, profound humiliation, and clinical depression. The severity and duration of these symptoms, which required professional medical intervention, underscore the grave impact of Hamann's actions and the company's stance, thus fulfilling the requirement of demonstrating severe emotional distress for an IIED claim.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Rafael Aguila, respectfully requests that the Court:

1) Recognize the violation of his civil rights under the Minnesota Human Rights Act.

2) Mandate Philips to initiate extensive training programs focusing on diversity, inclusion, and anti-discrimination, especially for managerial staff, to avert similar discriminatory incidents.

3) Issue an injunction requiring Philips to publicly apologize to Aguila, acknowledging the wrongful harm to his reputation and career and retracting all false statements made against him.

4) Direct Philips to immediately halt any further defamatory, retaliatory, or discriminatory conduct against Aguila and implement proactive measures ensuring non-recurrence.

5) Order Philips Boeblingen to reinstate Aguila to his prior role or an equivalent position, respecting his professional experience and expertise.

6) Award Aguila compensatory damages for significant economic losses, estimated at approximately $2,366,013, resulting from Philips's defamatory actions and his unjust termination.

7) Grant additional compensation for non-economic damages like mental anguish and emotional distress, proposed to be approximately $7,098,039, applying a thrice multiplier for the gravity of harm experienced.

8) Award punitive damages against Philips for their malicious, oppressive, and deliberate misconduct towards Aguila, in an amount deemed appropriate by the Court to serve as a deterrent against future similar actions by Philips or any other corporate entity.

9) Impose on Philips the responsibility for all legal expenses and attorney fees Aguila incurred due to this litigation.

10) Consider granting any further relief that the Court deems just and fair, in light of the severe impact of Philips's actions on Aguila's personal and professional life.

Dated: December 18, 2023

Respectfully submitted,

RAFAEL AGUILA, *pro se*

Address: 3253 S.W. 25th Street
    Miami, FL 33155
Phone: 786-633-2008
Email: raguila11@yahoo.com